Filed 10/29/15  In re A.H. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re A.H. et al., Persons Coming Under the Juvenile Court Law. | B261543 |
| _____ | (Los Angeles County |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Super. Ct. No. CK57697) |
| Plaintiff and Respondent, | |
| v. | |
| E.H., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Veronica S. McBeth, Judge.  Affirmed.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

_____

E.H. (mother) appeals from the juvenile court's denial of her request for a bonding study. We find no abuse of discretion and affirm the order.

## FACTUAL AND PROCEDURAL SUMMARY

This dependency case involves mother's eight children with J.H. (father)[1]: daughters A.H. (born in 2003) and Em.H. (born in 2013), and sons Wi.H. (born in 2004), B.H. (born in 2006), J.H. (born in 2008), Wa.H. (born in 2009), El.H. (born in 2010) and S.H. (born in 2012). We borrow some of the relevant facts about the family's dependency history from our most recent decision in the case, *E.H.* v. *Superior Court* (Aug. 29, 2014, No. B255970 [nonpub. opn.]).[2]

"[I]n 1998 father was convicted of willful cruelty to mother's child from another relationship, and mother failed to reunify with that child. The parents' two oldest children together, A.H. and Wi.H., were dependents of the court between 2005 and 2007, due to father's earlier abuse of their half sibling. Between 2008 and 2010, the parents' third child, B.H., was a dependent due to medical neglect.

"Since 2011, the parents' six oldest children have been the subjects of an open dependency case, based on sustained allegations that father hit A.H. in the face with his fist, mother failed to protect her, and both parents regularly gave her beer to drink. S.H., the parents' seventh child, was declared a dependent of the court after his birth in 2012, based on the sustained allegations in his older siblings' case. The parents were ordered to receive reunification services and to complete parenting education and individual counseling. In March 2013, the court terminated reunification services as to the six older children, but did not return the children to the parents' custody due to their insufficient

---

[1] Father is not a party to this appeal, but will be referred to as needed.

[2] Previous appeals and writ proceedings involving this family also include *In re A.H.* (July 16, 2014, No. B251288 [nonpub. opn.]); *In re S.H.* (Dec. 11, 2013, Nos. B245942 & B248323 [nonpub. opns.]); *In re A.H.* (July 20, 2012, No. B236022 [nonpub. opn.]); *In re B.H.* (July 31, 2009, No. B211691 [nonpub. opn.]; *Jeffrey H. v. Superior Court* (June 13, 2006, No. B189786 [nonpub. opn.]).

progress, father's disruptive behavior through most of the case, and mother's continued submissiveness to his control." (*E.H.* v. *Superior Court*, *supra*, at pp. 2–3.)

The parents' visits were briefly liberalized to unmonitored in March 2013, but in April 2013, J.H. and Wa.H. reported that father showed them a gun and threatened to kill their foster mother. (*E.H.* v. *Superior Court*, *supra*, at p. 3.) "In August 2013, mother gave birth to the couple's eighth child, Em.H., and father informed the social worker that he was willing to do whatever was necessary to have the children placed with mother. At a team decision meeting in September, mother admitted she had been a victim of domestic violence throughout her marriage to father, and she checked into a domestic violence shelter. In October, S.H. was referred for regional center assessment . . . [and] began receiving services in November. Also in November, the court terminated father's reunification services as to S.H., but continued services for mother." (*Ibid*.)

In January 2014, the court took jurisdiction over Em.H. and ordered family reunification services for mother, but not for father. At S.H.'s 18-month hearing in April 2014, mother represented that she recently had filed for divorce from father. (*E.H. v. Superior Court*, *supra*, at pp. 3–4.) The court, nevertheless, terminated mother's reunification services as to S.H. and declined to return the child to her because mother's professed resolve to separate from father was so recent and she was unaware of the child's special needs.[3] (*Id*. at p. 5.)

During the pendency of the case, the six oldest children were placed together once, after the disposition in 2011. Within less than three months, the caregiver requested that they be replaced because father had been letting himself into the caregiver's home and had threatened the caregiver's children. After that, the three oldest children, A.H., Wi.H. and B.H., were placed together between October 2011 and November 2013, when A.H. was replaced with her maternal grandmother, who was interested in becoming her legal guardian. After A.H.'s behavior deteriorated, which DCFS attributed to her increased

---

[3] In July 2014, S.H. was tentatively diagnosed with fetal alcohol spectrum disorder causing developmental delays. Although DCFS reports all children have been diagnosed with fetal alcohol syndrome, the children's health records show no such diagnosis.

contact with mother and mother's placing A.H. in touch with father, A.H. was removed from the grandmother's home. J.H. and Wa.H. had to be removed from their two-year-long potentially adoptive placement in 2013, after they reported father's threat to shoot their caregiver. An attempt to place all four boys with their maternal grandfather failed, and Wi.H. and B.H. were matched with a foster adoptive parent in June 2014. Around the same time, DCFS found a foster adoptive home for J.H. and Wa.H. as well. The sixth child, El.H., has been placed by himself in a foster adoptive home since 2011. The youngest children, S.H. and Em.H., have been placed in separate foster homes.

In May 2014, the Department of Children and Family Services (DCFS) filed a Welfare and Institutions Code section 388 petition,[4] requesting change in visitation because the children were exhibiting emotional and behavioral problems before, during, and after visits. DCFS reported father had called the older children at their placements and had threatened the caregivers. According to DCFS, mother's visits with the children went well, but mother had difficulty managing the boys when they misbehaved, and El.H. did not want to visit with mother and his siblings.

In August 2014, mother filed her own section 388 petition, requesting that A.H. and Em.H. be placed with S.H.'s caregiver, Ms. T. DCFS objected, citing substantiated emotional abuse in the caregiver's home. In October, mother filed another section 388 petition, requesting additional services and the return of the children to her care. Mother represented she was in the process of divorcing father, and the children were unhappy in their placements and wanted to live with mother. In response, DCFS reported there was no documentary proof that mother had filed for divorce, and it had reason to believe otherwise because father reportedly had been seen driving mother to a visit on July 2014, as well as being present at the home of S.H.'s caregiver, and mother appeared to have

---

[4] Unless otherwise indicated, subsequent references are to the Welfare and Institutions Code.

access to father's checking account.[5]  DCFS acknowledged A.H. wanted to live with mother, but represented that Wi.H. and B.H., and Wa.H. and J.H. wanted to remain with their respective foster adoptive parents.  DCFS continued to report that mother could not control the four older boys, who often misbehaved during visits.

In November 2014, mother requested that the court order a bonding study to establish the children would benefit from continuing the relationship with mother and their siblings.  Mother maintained the children asked her to take them home.  She also cited DCFS's reports that some of the children showed signs of distress at the end of visits, A.H. was more cooperative after spending time with mother, Wi.H. expressed a desire to return to his parents, Wi.H. and B.H. reportedly missed their older sister, Wa.H. was becoming "more clingy and affectionate" to mother, and even El.H. was starting to interact with mother and his brothers.  DCFS's recommendation was to establish a legal guardianship for A.H. and to free all other children for adoption.

At the December 2, 2014 hearing, mother's counsel argued that a bonding study by a "neutral third party professional" was necessary because of the conflict between mother's representations that the children wanted to go home with her and DCFS's reports to the contrary.  DCFS's counsel acknowledged there was a bond, but pointed out the court had had the case for two years whereas a bonding study examiner would observe mother and the children "for a couple of hours."  The court denied the request, noting it rarely found bonding studies to be helpful and concluding a bonding study would not be helpful "at this stage of the proceedings."

Mother appealed.

We granted DCFS's request for judicial notice of subsequent dependency proceedings.  Family reunification services for Em.H. were terminated in March 2015.  The court denied the section 388 petitions.  Parental rights to the five older boys were terminated in April 2015, and their caregivers were designated prospective adoptive parents.  That order is on appeal in case No. B264748.

---

[5] Based on his court filings, father has lived in Augusta, Georgia, since November 2013.

5

## DISCUSSION

The court had discretion to order a bonding study pursuant to Evidence Code section 730, which authorizes the appointment of fact-finding experts. (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1084.) Expert witnesses are necessary where "expert evidence is or may be required," and their testimony is limited to "a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid.Code, §§ 730, 801, subd. (a).) We review an order denying a bonding study for abuse of discretion. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1341.) The question is whether "under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study. [Citation.]" (*Ibid*.)

A bonding study may help a parent show that termination of parental rights is precluded by the beneficial parental relationship exception of section 366.26, subdivision (c)(1)(B)(i) or the sibling relationship exception in subdivision (c)(1)(B)(v). (See *In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1167; see also *In re Jacob S.* (2002) 104 Cal.App.4th 1011, 1018, disapproved on another ground in *In re S.B.* (2009) 46 Cal.4th 529, 537, fn. 5.) It also may strengthen a parent's request for reinstatement of reunification services. (*In re Richard C.* (1998) 68 Cal.App.4th 1191, 1196.)

However, "[t]here is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to a termination order . . . [A]lthough the preservation of a minor's family ties is one of the goals of the dependency laws, it is of critical importance only at the point in the proceeding when the court removes a dependent child from parental custody [citation]. Family preservation ceases to be of overriding concern if a dependent child cannot be safely returned to parental custody and the juvenile court terminates reunification services. Then, the focus shifts from the parent's interest in reunification to the child's interest in permanency and stability. [Citation.] [Fn. omitted.]" (*In re Lorenzo C.*, *supra*, 54 Cal.App.4th at pp. 1339–1340.)

Because of this shift of focus to the child's interest in permanency and stability, a parent is "required to muster her evidence before the termination of reunification

6

services. The kind of parent-child bond the court may rely on to avoid termination of parental rights under the [beneficial parental relationship exception] does not arise in the short period between the termination of services and the section 366.26 hearing. 'The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent. [¶] At the time the court makes its determination, the parent and child have been in the dependency process for 12 months or longer, during which time the nature and extent of the particular relationship should be apparent.' (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575; see also *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.)" (*In re Richard C.*, *supra*, 68 Cal.App.4th at p. 1196–1197.)

Mother's reunification services as to the six older children had been terminated since March 2013, over 18 months before her request for a bonding study in November 2014, and her reunification services as to S.H. had been terminated over six months before, in April 2014. While mother still received reunification services as to one-year-old Em.H., as to the rest of the children, her request for a bonding study came long after the focus had shifted from family reunification to permanent placement.[6] Moreover, as to the six older children, the case had been pending for three years, and the record is replete with evidence regarding their various living arrangements and differing attachments to each other and to mother.

Mother's main reason for requesting the bonding study was the conflict between her representation that the children wanted to live with her and DCFS's representation that the four older boys had stated they wanted to remain in their placements. The wishes of the older boys, who in 2014 were between 5 and 10 years old, could be ascertained by the court. (See e.g. § 366.26, subd. (h) [providing procedure for taking children's

---

[6] The delays in holding the section 366.26 hearings appear to have been due to a variety of causes, such as the need to find new homes for some of the children because of their special needs or behavioral problems, difficulties with finding appropriate placements, father's interference and threats to caregivers, and the fact that some of the children lacked birth certificates because the parents did not register their births.

testimony].)  In fact, the record shows mother's counsel requested that the older children be present at the section 388 hearing, and according to the minute order from the April 1, 2015 hearing, of which we take judicial notice, several children did testify on that date. The record also indicates that, as of August 2014, the six older children were either in therapy or scheduled to begin therapy.  The views of A.H.'s therapist are in the record, and the other therapists presumably could report on the children's attachments once therapy was underway.

Mother cites *In re Amber M.* (2002) 103 Cal.App.4th 681, 690–691 and *In re S.B.* (2008) 164 Cal.App.4th 289, 301.  The record in each of these cases included a bonding study that supported the application of the beneficial parental relationship exception.  In contrast, she argues, the record in *In re C.B.* (2010) 190 Cal.App.4th 102, 125 did not include such a study, and the court concluded that the undisputed fact the children loved their parents did not establish the exception.  Mother fails to appreciate that the bonding studies in *In re Amber M.* and *In re S.B.* were in line with other evidence in the records of those cases, and that the appellate court in *In re C.B.* remanded the case for reconsideration of the beneficial parental relationship exception because the juvenile court had assumed the relatives with whom the children were placed would allow future contact with the parents.  (*Id*. at pp. 128–129.)

Mother appears to suggest that a parent cannot establish the exception without a bonding study, or that the court cannot evaluate the relationship between the children and mother without such a study.  A bonding study is not required in every case (*In re Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1339), and it is not unreasonable to conclude that the nature of the relationship in a case pending as long as this one may be discerned from the record.  (*In re Richard C.*, *supra*, 68 Cal.App.4th at p. 1196.)

8

**DISPOSITION**

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EPSTEIN, P. J.

We concur:

WILLHITE, J.

MANELLA, J.